UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re PARMALAT SECURITIES LITIGATION

MASTER DOCKET

This document relates to: 05 Civ. 4015                                04 MD 1653 (LAK)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
ENRICO BONDI,

                                Plaintiff,

                -against-                                 05 Civ. 4015 (LAK)

BANK OF AMERICA CORPORATION, et al.,

                                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OPINION**


                Appearances:

                                John B. Quinn
                                R. Brian Timmons
                                Loren Kieve
                                Michael B. Carlinsky
                                QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
                                *Attorneys for Plaintiff*

                                Joseph B. Tompkins, Jr.
                                Alan C. Geolot
                                Mark P. Guerrera
                                SIDLEY AUSTIN BROWN & WOOD LLP
                                *Attorneys for Defendants*


LEWIS A. KAPLAN, *District Judge.*

                Plaintiff Enrico Bondi has served since December 2003 as the Extraordinary

Commissioner of Parmalat Finanziaria S.p.A., Parmalat S.p.A., and 21 affiliated entities (the

"Parmalat Debtors") in the Italian reorganization proceedings known as Extraordinary Administration.[1] His position is roughly equivalent to that of a chapter 11 bankruptcy trustee in the United States. This action, which was filed in the United States District Court for the Western District of North Carolina and transferred here by the Judicial Panel on Multidistrict Litigation, alleges in substance that Bank of America Corporation and affiliates[2] (collectively "BoA" or the "Bank") structured transactions that operated to defraud the Parmalat Debtors and their investors. The defendants move to dismiss the action for failure to state a claim and to join indispensable parties.[3]

## I.   The Complaint

The thrust of the complaint, the well-pleaded factual allegations of which are presumed true for purposes of this motion, is that BoA assisted the Parmalat Debtors, their affiliates (collectively "Parmalat" or the "Company") and these companies' managers in "structuring and executing a series of complex, mostly off-balance sheet, financial transactions that were deliberately

---

[1]
See *Bondi v. Grant Thornton Int'l*, 322 B.R. 44, 45-46 (S.D.N.Y. 2005) ("*Bondi I*"); *In re Parmalat Finanziaria S.p.A.*, 320 B.R. 46, 47-48 (S.D.N.Y. 2005); Joint Report on the Status of Proceedings in Italy (Jan. 18, 2005) (04 MD 1653, docket item 47) ("Joint Report").

[2]
The defendants are Bank of America Corporation, Bank of America National Trust & Savings Association, Banc of America Securities, LLC, Banc of America Securities Limited ("BASL"), and Bank of America, N.A. The complaint names also Bank of America International, Ltd., but the parties agree that that entity is the same as BASL.

[3]
BASL joins in the main BoA motion and moves to dismiss also for lack of personal jurisdiction. Its personal jurisdiction defense is addressed in a separate ruling issued today.

designed to conceal Parmalat's insolvency."[4] The Bank's "knowing assistance ensured that Parmalat's financial statements were false and misleading. . . . The eventual result of this deception was Parmalat's bankruptcy[.]"[5] According to the complaint:

> "[k]eeping Parmalat's actual financial condition secret was crucial to the ability of certain Parmalat insiders . . . to maintain an investment grade credit rating for Parmalat. This allowed them to continue to raise additional financing for (a) their massive acquisition campaign, (b) their equally massive looting of the company and (c) their effort to keep the company afloat amid a mounting wave of losses, debts and disappearing funds."[6]

A.    *Specific Transactions*

1.    *December 1997 Credit Agreement with Venezuelan Subsidiary*

On December 16, 1997, BoA entered into an $80 million five-year credit agreement with one of Parmalat's Venezuelan subsidiaries. The parties did not disclose a side letter that gave BoA additional guarantees, a $120,000 "Arrangement Fee," and interest beyond the publicly-disclosed rate. In other words, the transaction made Parmalat appear healthier and more credit-worthy than BoA knew that it was.[7]

---

[4]    Cpt. ¶ 1.

[5]    *Id.* ¶ 75.

[6]    *Id.* ¶ 204.

[7]    *Id.* ¶¶ 77-87.

2.      *September 1998 Loans Secured by Cash Raised Through Private Placements of Debt[8]*

On September 29, 1998, BoA entered into an $80 million eight-year credit agreement with two of Parmalat's Venezuelan subsidiaries and a $100 million credit agreement with a Brazilian subsidiary. The loans were secured by cash deposits made by Eurofood IFSC Limited ("Eurofood"), an Irish Parmalat subsidiary, in the entire amounts of the respective loans. Eurofoods obtained the funds through issuance of eight-year notes to institutional investors in the United States in private placements arranged by BoA. In other words, the flow of funds in substance was from the investors to the South American subsidiaries. BoA had no risk, but when Parmalat's troubles came to light in December of 2003, BoA foreclosed on the collateral for the loan to the Venezuelan subsidiaries.

The fact that the loans were secured by cash put up by Parmalat was not disclosed publicly. Consequently, the purchasers of the eight-year notes did not know that they were contributing collateral for BoA loans. Nor did the purchasers of Parmalat's publicly-traded securities know that Parmalat had approximately $180 million less available cash than its financial statements indicated. Side letters that increased the fees and interest payable to BoA also were not disclosed, thus further distorting Parmalat's financial picture.[9] In addition, the actual purpose of the Venezuela loans was to extinguish debt under the December 16, 1997 agreement – not, as the public disclosure suggested, "to fund import/export activities by the Venezuelan companies."[10]

---

[8]     The complaint in the consolidated securities fraud action includes a version of these allegations. *See In re Parmalat Sec. Litig.*, No. 04 MD 1653, 2005 WL 1653638, at *6 (S.D.N.Y. July 13, 2005).

[9]     Cpt. ¶¶ 88-107, 112-30.

[10]     *Id.* ¶¶ 108-09.

Finally, the complaint alleges that Parmalat, starting in September 2001, made premium payments on a new credit risk insurance policy. The payments, which totaled $20 million, were deposited to an account controlled by BoA officers, rather than paid to the underwriter of the policy.[11]

### 3.     October 1999 Credit Agreement with Mexican Subsidiary

On October 12, 1999, BoA signed a $25 million credit agreement with a Mexican subsidiary of Parmalat. Again, the loan was collateralized with approximately $25.5 million in cash deposited by a Parmalat entity. The complaint alleges a complicated series of transfers, but the end result was that the money moved from one Parmalat entity to another. BoA had no exposure but received an annual interest spread and fees. In December of 2003, the Bank foreclosed on the collateral.[12]

### 4.     $300 Million Equity Investment in Administracao[13]

BoA allegedly structured a set of transactions pursuant to which $300 million of privately placed debt issued by a Brazilian Parmalat subsidiary was disguised as an equity investment. In particular, BoA created two special purpose entities (SPEs) that purchased $300 million worth of stock, equivalent to an 18 percent stake, in Parmalat Administracao S.A. ("Administracao"). The SPEs in turn issued four-year notes that were purchased by BoA,

---

[11]

*Id.* ¶ 110.

[12]

*Id.* ¶¶ 131-41.

[13]

The securities fraud complaint includes a version of these allegations. *See In re Parmalat Sec. Litig.*, 2005 WL 1653638, at *5.

institutional investors in the United States, and another Parmalat subsidiary.[14] Administracao booked $130 million of the $300 million as equity. The remaining $170 million was booked as goodwill "and then funneled to Wishaw Trading, a Uruguayan shell entity controlled by the Tanzi family, for the benefit of unknown parties."[15] (Calisto Tanzi was Parmalat's founder and former chief executive officer,[16] and certain members of his family served as officers, directors, or advisors of the Company.[17]) Furthermore, Parmalat never accounted for $150 million repaid to BoA in connection with these transactions.[18]

Luca Sala, a BoA employee, advised Parmalat in December 1999 how to describe the transaction in a press release so that it would appear to be equity rather than debt. The appraisal value of Administracao used in the press release, denominated in dollars, was inappropriately high, in part because the parties used an old report prepared before the Brazilian currency was devalued.[19]

In September 2001, Parmalat gave the SPEs put options that gave them the right to sell the Administracao shares for amounts that would retire the notes.[20] When Parmalat's troubles

---

[14]     Cpt. ¶¶ 142-50.

[15]     *Id*. ¶ 168.

[16]     *See id*. ¶ 204.

[17]     *See* Joint Report 3, 6.

[18]     Cpt. ¶ 169.

[19]     *Id*. ¶¶ 156-64.

[20]     *Id*. ¶¶ 152-54.

came to light, BoA attempted to exercise the SPEs' puts. BoA then forced the SPEs and a Parmalat entity into liquidation proceedings in the Caymans, allegedly to frustrate Bondi's restructuring efforts and an investigation of BoA's officials.[21]

> 5. *December 2001 Credit and Interest Rate Swap Agreements with Chilean and African Parmalat Subsidiaries*

Under a set of agreements dated December 14, 2001, BoA made a series of loans to Parmalat subsidiaries – $25 million to an entity that the plaintiffs call "Parmalat Chile," $20 million to "Parmalat South Africa," and $15 million to "Parmalat Africa." At the same time, BoA and Parmalat Africa signed what purported to be an interest rate swap agreement, which effectively required that BoA pay $5.2 million each year to a Swiss bank account ostensibly owned by Parmalat Africa. Side letters required Parmalat Chile and Parmalat South Africa to pay BoA additional interest on their loans approximately equal to the BoA's annual $5.2 million payments to Parmalat Africa's ostensible bank account.[22] The account, however, was not Parmalat Africa's. Instead it "has been linked to Bank of America officials."[23] Moreover, the swap agreement was not in actual substance a swap. It specified "no currency or interest rate exchanges and offered the counterparties no ability to hedge."[24] In other words, the agreements were a device for Parmalat to make illicit payments to BoA officials.

---

[21]
> *Id.* ¶¶ 176-77.

[22]
> *Id.* ¶¶ 180-83.

[23]
> *Id.* ¶ 184.

[24]
> *Id.*

In August 2003, the Bank asked Parmalat to guarantee the $60 million of credit extended under the December 14, 2001 agreements and since then has attempted to foreclose on the loans and threatened to force insolvency proceedings in the relevant countries.[25]

6.    *December 2001 $80 Million Loan Secured by Funds Raised Through BoA's Sale of Notes*[26]

On December 20, 2001, BoA entered into a set of transactions pursuant to which it extended an $80 million loan to Parmalat that was secured by the proceeds of a private placement of notes issued by a Parmalat entity to institutional investors. As with some of the other transactions reviewed above, BoA assumed no risk but received fees and an interest spread and later foreclosed on the $80 million of collateral.[27]

7.    *Private Placements in General*

BoA placed $1.3 billion of debt in the United States on behalf of various Parmalat entities. Parmalat surreptitiously purchased many of its own bonds, a circumstance that was hidden by the use of sham entities that BoA helped Parmalat create and that reduced BoA's exposure.[28]

---

[25]

*Id.* ¶¶ 185-87.

[26]

The securities fraud complaint includes a version of these allegations. *See In re Parmalat Sec. Litig.*, 2005 WL 1653638, at *6.

[27]

*Id.* ¶¶ 188-94.

[28]

*Id.* ¶¶ 195-96.

B.      *Causes of Action*

The complaint asserts counts for (1) fraud, (2) aiding and abetting constructive fraud, (3) negligent misrepresentation, (4) aiding and abetting breach of fiduciary duty, (5) diversion of corporate assets, (6) unjust enrichment, (7) violation of North Carolina's Uniform Fraudulent Transfer Act, (8) deepening insolvency, (9) unlawful civil conspiracy, and violations of (10) Section 75-1.1 of the North Carolina General Statutes, which prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce," (11) the federal Racketeer Influenced and Corrupt Organizations ("RICO") statutes,[29] and (12) the North Carolina RICO Act.[30]

## II.   The Standard

As a general rule, a court deciding a Rule 12(b)(6) motion accepts as true all well-pleaded factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor.[31]  Dismissal is inappropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[32]  Where a complaint alleges fraud, however, the plaintiff is held to a more exacting standard. Rule 9(b) requires that the

---

[29]

18 U.S.C. §§ 1961-68.

[30]

N.C. Gen Stat. §§ 75D-1 – 75D-14.

[31]

*E.g.*, *Flores v. Southern Peru Copper Corp.*, 343 F.3d 140, 143 (2d Cir. 2003); *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001).

[32]

*Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (internal quotation marks omitted)).

circumstances constituting fraud be stated with particularity, which means, among other things, that the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."[33]

### III.   Threshold Matters

#### A.   Choice of Law

The Judicial Panel on Multidistrict Litigation transferred this action here from the Western District of North Carolina pursuant to Section 1407 of Title 28 of the U.S. Code. In such circumstances, a transferee court in the Second Circuit applies its own interpretation of federal law, not that of the transferor court.[34] To the extent that the action involves issues of state law, this court applies the choice of law rules that would govern in the transferor forum.[35]

#### B.   Bondi Stands in the Shoes of Parmalat

The defendants argue that Bondi lacks standing to bring many of the causes of action because they belong not to the Parmalat Debtors but to their creditors, whom Bondi does not

---

[33]

*Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994) (internal quotation marks and citation omitted)); *accord In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69-70 (2d Cir. 2001).

[34]

*Menowitz v. Brown*, 991 F.2d 36, 40-41 (2d Cir. 1993).

The Fourth Circuit recognizes the same rule. *See Bradley v. United States*, 161 F.3d 777, 782 n.4 (4th Cir. 1998).

[35]

*See Van Dusen v. Barrack*, 376 U.S. 612, 638-39 (1964); *Ferens v. John Deere Co.*, 494 U.S. 516 (1990).

represent. Although his position is not entirely consistent, Bondi at times contends that his status as

Extraordinary Administrator gives him standing to assert claims on behalf of creditors as well. The

complaint, for example, states that Bondi has the authority to pursue the claims of the Parmalat

Debtors but says nothing about authority to pursue the claims of creditors.[36] In his brief, however,

the plaintiff asserts that he is "empowered to bring this action against third parties on behalf of the

company and its stakeholders . . . that would otherwise be unable to recover for the misdeeds of third

parties," but for this proposition cites only the complaint,[37] which says nothing about authority to

recover on behalf of stakeholders.

A chapter 11 bankruptcy trustee stands in the shoes of the defunct corporation and

may assert only claims that the debtor could have asserted at the moment before it entered

bankruptcy. The trustee may not assert claims that belong to the creditors.[38] Whether a claim belongs

---

[36]

The relevant allegations are:

"In his capacity as Extraordinary Commissioner, Dr. Bondi has the authority and duty to sue *on behalf of Parmalat to recover for wrongs done to Parmalat . . . for the benefit of the entire Parmalat estate.*

"Dr. Bondi also has the authority and duty to investigate the Parmalat companies, and to take any action he deems necessary *to preserve the estate and causes of action owned by the Parmalat companies he is overseeing* as part of his extraordinary administration *for the benefit of all their creditors and stakeholders*.

"This action is being brought by Dr. Bondi on behalf of Parmalat Finanziaria S.p.A., Parmalat S.p.A. and their subsidiary and affiliates companies throughout the world that are part of Dr. Bondi's Extraordinary Administration." Cpt. ¶¶ 17-19 (emphases added).

[37]

Bondi Mem. 7; *see also id.* at 10.

[38]

*E.g.*, *Wight v. Bankamerica Corp.*, 219 F.3d 79, 86 (2d Cir. 2000); *In re Mediators, Inc.*, 105 F.3d 822, 825-26 (2d Cir. 1997); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1093 (2d Cir. 1995).

to the debtor or to its creditors is a function of the substantive law governing each claim.[39]

Here, the parties have given the court no reason to believe that Italian law on this point differs from that of the United States. To be sure, the plaintiff's brief asserts that:

> "The 'Extraordinary Administration' constitutes a 'governmental temporary taking' of the distressed corporation, with the purpose of avoiding its liquidation. (Legislative Decree 347/2003.) Under the 2003 rules of 'extraordinary administration,' Dr. Bondi is a private organ of the Ministry of Productive Activities itself. As such, he is not simply representing 'Parmalat,' but 'Parmalat's Extraordinary Administration,' a quasi-public entity."[40]

But the plaintiff has submitted nothing to support these assertions, which in any case do not speak to the issue whether Italian law gives Bondi the right to sue on behalf of creditors of the bankrupt estate.

Where, as here, there is a failure of proof of foreign law, the court may presume that it is the same as local law.[41] Bondi therefore may assert only claims that belonged to the Parmalat Debtors at the moment that they entered Extraordinary Administration. The claims that belong only to creditors, to whatever extent Bondi actually seeks to assert them, are dismissed.

---

[39] Bondi argues that, under U.S. law, a trustee in bankruptcy "is permitted to act for the creditors as a whole where the claim is asserted generally for the benefit of all creditors as an undifferentiated group." Bondi Mem. 11. The Court rejected this argument in an earlier opinion. *See Bondi v. Grant Thornton Int'l* (*In re Parmalat Sec. Litig.*), No. 04 Civ. 9771 (LAK), 2005 WL 1670246, at *19 (S.D.N.Y. July 18, 2005) ("*Bondi II*").

[40] *See, e.g.*, *Wight*, 219 F.3d at 86; *Mediators*, 105 F.3d at 825; *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 700 (2d Cir. 1989).

*Id.* at 7-8 n.3.

[41] *See Fairmont Shipping Corp. v. Chevron Int'l Oil Co.*, 511 F.2d 1252, 1261 n.16 (2d Cir. 1975); *Bartsch v. Metro-Goldwyn-Mayer, Inc.*, 391 F.2d 150, 155 n.3 (2d Cir. 1968); FED. R. CIV. P. 44.1.

*C.*     *Applicability of the* In Pari Delicto *Defense*

BoA argues that many of the Parmalat Debtors' claims are barred by the doctrine of *in pari delicto*,[42] which forecloses recovery by a claimant that was a participant in the complained-of wrong.[43]

*1.*     Wagoner *Does Not Control*

BoA launches its attack by relying upon the statement in *Shearson Lehman Hutton, Inc. v. Wagoner*[44] that where "a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage to the creditors."[45] While the Bank perhaps understandably tends to run the point together with the standing argument that the Court already has disposed of, it appears to contend that *Wagoner* stands also for the proposition that a third party that is complicit in wrongdoing of the former management of a bankrupt company may assert the misconduct of the company's former management as a defense to a claim against it by the

---

[42]

The phrase is short for "*in pari delicto potior est conditio possidentis [defendentis]*," or "in a case of equal or mutual fault . . . the condition of the party in possession [or defending] is the better one." *See Skinner v. E.F. Hutton & Co.*, 333 S.E.2d 236, 239 (N.C. 1985).

[43]

"[A] complaint can be dismissed for failure to state a claim pursuant to a Rule 12(b)(6) motion raising an affirmative defense 'if the defense appears on the face of the complaint.'" *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir. 2003) (quoting *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir.1998)) (upholding 12(b) dismissal based on *in pari delicto* defense); *see also McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004); *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989).

[44]

944 F.2d 114 (2d Cir. 1991).

[45]

BoA Mem. 5 (quoting *Wagoner*, 944 F.2d at 118).

bankrupt estate. But there is a fundamental problem with the Bank's use of *Wagoner*. The case, to whatever extent it may be relevant to the *in pari delicto* issue, is an application of New York law.[46] The question whether the Parmalat Debtors are chargeable with the fraud allegedly perpetrated by the companies' former management, and thus whether Bondi is subject to a defense of *in pari delicto*, is governed by the law of North Carolina.[47] *Wagoner* simply is not controlling here. At most it is potentially persuasive authority regarding New York's treatment of (a) joint tortfeasors' right to recover from each other, and (b) the imputation of an agent's acts or knowledge to its principal. Because *Wagoner* does not elaborate on these issues, and because the governing law here is that of North Carolina rather than New York, the Court declines to ground its analysis in *Wagoner* and its progeny.

2.    In Pari Delicto *Applies Because the Complaint Alleges that Parmalat Was a Participant in the Complained-of Wrongs*

The complaint alleges that Parmalat engaged in a massive fraud and that BoA assisted in some respects, to wit:

> "Bank of America knew that the result of its 'assistance' was that *Parmalat's* financial statements overstated its publicly reported shareholder's equity and earnings, understated its reported debt, and presented materially false and misleading financial statements to regulators, analysts and investors . . . .

---

46

    *See Wight*, 219 F.3d at 86-87.

47

    The parties have not asked the Court to apply the law of any foreign jurisdiction. In North Carolina, "[t]he party seeking to have the law of a foreign jurisdiction apply has the burden of bringing such law to the attention of the court. If the foreign jurisdiction has no law, either statutory or decisional, on the question involved, the courts of this state will not speculate what law such jurisdiction might adopt and will apply the law of North Carolina." *Leonard v. Johns-Manville Sales Corp.*, 305 S.E.2d 528, 531 (N.C. 1983); *see also* text accompanying footnote 41 above (same point for issues of federal law).

> "Bank of America's and *Parmalat's* manipulation of Parmalat's financial results also
> had a dramatic impact on its 'debt-to-equity ratio' . . . . This was important to the
> scheme because the better the credit rating, the lower Parmalat's cost of funds.

* * *

> "Bank of America's transactions with *Parmalat* were knowingly designed to assist
> *Parmalat* in perpetrating a broad, continuing series of plainly fraudulent transactions.

* * *

> "Bank of America continued to arrange financing for Parmalat, without telling new
> investors, other existing creditors or Parmalat's shareholders that (a) the transactions
> were quite different than characterized by Bank of America and *Parmalat* . . . ."[48]

Moreover, the detailed allegations regarding the challenged transactions make it quite clear that the

Parmalat entities were crucial actors in these transactions.

The North Carolina Supreme Court has explained the *in pari delicto* doctrine as

follows:

> "The law generally forbids redress to one for an injury done him by another, if he
> himself first be in the wrong about the same matter whereof he complains. . . . No
> one is permitted to profit by his own fraud, or to take advantage of his own wrong,
> or to found a claim on his own inequity, or to acquire any rights by his own crime."[49]

This straightforward principle would appear to bar recovery by Bondi from BoA except to the extent

that the complaint alleges that BoA aided and abetted a breach of the Parmalat insiders' duties to the

Company.

---

[48]     Cpt. ¶¶ 73-74, 197, 201 (emphases added).

[49]     *Byers v. Byers*, 25 S.E.2d 466, 469-70 (N.C. 1943); *see also Skinner v. E.F. Hutton & Co.*,
333 S.E.2d 236, 239 (N.C. 1985); *Bean v. Home Detective Co.*, 173 S.E. 5, 6 (N.C. 1934).

### 3.    The Attribution of Wrongdoing to Culpable Insiders Does Not Prevent the Application of In Pari Delicto

The plaintiff seeks to avoid the *in pari delicto* defense by ignoring the allegations that Parmalat itself perpetrated wrongdoing. Bondi focuses instead on the sections of the complaint that attribute wrongdoing on Parmalat's end to a group of "culpable insiders." But this is of no avail.

The acts performed and knowledge acquired by a corporate officer or agent are imputed to the corporation where the officer or agent was acting within the scope of his or her employment.[50] When the "officer or agent is acting in his own behalf, and does not act in any official or representative capacity for the corporation,"[51] however, the agent's acts and knowledge, under general agency principles applied in the specific context of the corporation, are not imputed. As the North Carolina Supreme Court has explained:

> "[T]here is a well-defined exception to the general rule that knowledge of the agent is imputed to the principal. Where the conduct of the agent is such as to raise a clear presumption that he would not communicate to the principal the facts in controversy, or where the agent, acting nominally as such, is in reality acting in his own business or for his own personal interest and adversely to the principal, or has a motive in concealing the facts from the principal, this rule does not apply. Where the agent is dealing in his own behalf, or has personal interest to serve, the knowledge of [the]

---

[50]

   *See, e.g., Whitten v. Bob King's AMC/Jeep, Inc.*, 231 S.E.2d 891, 895 (N.C. 1977); *Sledge Lumber Corp. v. Southern Builders Equip. Co.*, 126 S.E.2d 97, 100 (N.C. 1962); *Le Duc v. Moore*, 15 S.E. 888, 888 (N.C. 1892); *see also* 3 FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 790 ("the general rule is well established that a corporation is charged with constructive knowledge, regardless of its actual knowledge, of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of employment within the scope of his or her authority").

[51]

   *Brite v. Penny*, 72 S.E. 964, 965 (N.C. 1911); *accord Hice v. Hi-Mil, Inc.*, 273 S.E.2d 268, 272 (N.C. 1981); *Sledge Lumber Corp.*, 126 S.E.2d at 100; *Brinson v. Mill Supply Co.*, 14 S.E.2d 509, 514 (N.C. 1941); *Stansell v. Payne*, 127 S.E. 693, 695 (N.C. 1925).

agent is not imputable to the principal."[52]

These principles mean that even where the complaint speaks of Parmalat's insiders rather than Parmalat, the relevant actions and conduct must be imputed to the Company to the extent that the complaint makes it clear that the agents were acting for the Company as well as themselves. The complaint specifically states, for example, that:

> "Bank of America assisted certain Parmalat senior managers in structuring and executing a series of complex, mostly off-balance sheet, financial transactions *that were deliberately designed to conceal Parmalat's insolvency.*
>
> *       *       *
>
> "Keeping Parmalat's actual financial condition secret was crucial to the ability of certain Parmalat insiders . . . to maintain an investment grade credit rating for Parmalat. This allowed them to continue to raise additional financing for *(a) their massive acquisition campaign*, (b) their equally massive looting of the company and *(c) their effort to keep the company afloat amid a mounting wave of losses, debts and disappearing funds*."[53]

Bondi's submissions can be construed as making two major arguments against imputing the corrupt insiders' acts and knowledge to the Company. The first is that the insiders' actions did not benefit the Company. That, however, is immaterial. Agents frequently make decisions that prove to disadvantage their principals. The question is not whether the officers' actions ultimately were good or bad for the corporation, but whether the officers were conducting their own

---

[52]

*Federal Reserve Bank of Richmond v. Duffy*, 188 S.E. 82, 84 (N.C. 1936) (citations omitted); *accord Sparks v. Union Trust Co. of Shelby*, 124 S.E.2d 365, 368 (N.C. 1962); *Wilson Lumber & Milling Co. v. Atkinson*, 78 S.E. 212, 215 (N.C. 1913); *see also* RESTATEMENT (SECOND) OF AGENCY § 282 ("[a] principal is not affected by the knowledge of an agent in a transaction in which the agent *secretly* is acting adversely to the principal and *entirely* for his own or another's purposes . . . ." (emphases added)).

[53]

Cpt. ¶¶ 1, 204 (emphases added).

business or the corporation's.[54]

Bondi's other argument is that the complaint contains specific allegations that the agents were acting for themselves rather than for the Company. This is not entirely accurate and, in any case, is not sufficient to save the day.

At oral argument, the Court asked plaintiff's counsel whether and where the complaint alleged that the insiders acted solely for their own benefit. He ultimately responded by pointing only to paragraph 292, which states that "[t]he acts of Parmalat's insiders conferred no benefit on Parmalat. They were all done solely to enrich themselves at the company's expense."[55] This paragraph, however, appears only in Count Eight and therefore at best applies to that count and those that follow, which incorporate by reference all previous allegations.

Bondi's counsel later wrote to invite the Court's attention to paragraph 237, which appears in Count One and states that "[n]one of the conduct, acts and omissions described above benefited [*sic*] [Parmalat], but was done solely to benefit Bank of America and its officers and employers [*sic*] and the corrupt Parmalat insiders." That allegation, however, follows a series of allegations about the Bank's activities. The context makes it clear that "the conduct, acts and

---

[54]

Bondi's invocation of the "adverse interest" exception to the *Wagoner* rule would not avail even if *Wagoner* and its Second Circuit progeny were controlling here, which, as explained above, they are not. The Second Circuit repeatedly has emphasized that New York's adverse interest exception "is a narrow one and applies only when the agent has 'totally abandoned' the principal's interests." *Mediators*, 105 F.3d at 827 (citation omitted); *accord In re Bennett Funding Group, Inc.*, 336 F.3d 94, 100 (2d Cir. 2003); *Wight*, 219 F.3d at 87. As discussed above, the complaint does not indicate that Parmalat's insiders totally abandoned the Company's interests in conducting the great majority of activities in respect to which the complaint seeks to hold BoA liable.

[55]

Tr. 23-24.

omissions described above" refers in the main to BoA's actions, not actions by the Parmalat insiders.

More generally, the Court is obliged to read the complaint as a whole. The first section is entitled "Nature of this Action" and alleges in substance that the Bank took part in a number of identified financing arrangements through which Parmalat misrepresented its financial health. Subsequent sections entitled "Background – Parmalat's Founding and Ostensible Growth" and "The Vital Role of the Bank of America" are to the same effect. The core of the complaint is a section entitled "Bank of America's Fraudulent and Wrongful Conduct" that presents the details of the financing transactions. The gravamen of this complaint thus is a claim that the Bank is liable for its role in a series of specific transactions. These transactions all were obviously the business of, and intended to benefit, Parmalat and not just its agents. As "[g]eneral, conclusory allegations need not be credited . . . when they are belied by more specific allegations of the complaint,"[56] the insiders' roles in these transactions are imputed to the Parmalat Debtors.

    *4.*    In Pari Delicto *Does Not Apply to the Extent the Complaint Alleges Looting*

In addition to its attack on the specific transactions outlined above, the complaint contains also a number of vague allegations of looting by Parmalat insiders.[57] Giving it a generous

---

[56]

    *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995).

[57]

    The only arguable specification – and it is not one to which the parties have pointed – is paragraph 168, which alleges that $170 million of the $300 million raised through the December 1999 ostensible sale of equity in Administracao was "appropriated by Parmalat Admin's parent . . . and then funneled to Wishaw Trading, a Uruguayan shell entity controlled by the Tanzi family, for the benefit of unknown parties." This allegation, however, does not specify for whose benefit the transfer was made. That is, the transfer may have been part of an effort to benefit Parmalat using off-balance sheet transactions rather than looting.

reading, it alleges also that BoA, in addition to designing and entering into the transactions at the core of the complaint, somehow facilitated that looting.[58]

By any standard, theft from a corporation by insiders is self dealing by the insiders and not in any sense in the interest of the entity. The insiders' actions and knowledge in engaging in such conduct therefore cannot be imputed to the company. Accordingly, to the extent that the complaint alleges that BoA assisted the insiders in stealing from Parmalat, *in pari delicto* does not apply.

## IV. Sufficiency of the Claims

### A. Counts One and Three: Fraud and Negligent Misrepresentation[59]

There are two problems with the claims for fraud and negligent misrepresentation. The first is that recovery is barred by *in pari delicto* because the Company was an active participant in all of the transactions that allegedly operated as a fraud upon it. The second is that fraud and negligent misrepresentation claims require that the plaintiff have relied to its detriment on representations by the defendant. Nothing in the complaint indicates that Parmalat, which is charged with the knowledge of the officials who were responsible for the relevant transactions, relied to its

---

[58]

    *See id.* ¶ 231 ("In active participation and collaboration with certain culpable Parmalat insiders, Bank of America contrived to have Parmalat . . . continue to allow the culpable Parmalat insiders to use shell and sham companies and to engage in fictitious and sham transactions to loot the company and enrich themselves at its expense.").

[59]

    The relevant fraud here is fraud on the Company, not the purchasers of its securities, whom Bondi does not represent. Bondi's many arguments about the damage suffered by purchasers of Parmalat's securities due to alleged misrepresentations of Parmalat and the Bank therefore are irrelevant in this action.

detriment on representations by BoA.[60] Counts One and Three therefore dismissed.

B.    *Count Two: Aiding and Abetting Constructive Fraud*

Assuming without deciding that North Carolina recognizes a cause of action for aiding and abetting constructive fraud, Count Two is entirely subsumed within the claim for aiding and abetting breach of fiduciary duty. As the North Carolina courts and the plaintiff acknowledge, "[t]he primary difference between pleading a claim for constructive fraud and one for breach of fiduciary duty is the constructive fraud requirement that the defendant benefit himself."[61] Indeed, review of the North Carolina cases reveals that this is the only difference relevant here.[62] It follows that the only difference relevant here between a cause of action for aiding and abetting constructive fraud and one for aiding and abetting breach of fiduciary duty is that the former would contain the additional requirement that the primary violators – in this case, Parmalat's insiders – benefitted themselves. Count Two therefore is entirely redundant of Count Four. It is dismissed.

---

[60]

The fraud claim contains a vague allegation of looting, *see id.* ¶ 231 (quoted above in footnote 58), but it is not pled with particularity and therefore runs afoul of Rule 9(b).

[61]

*White v. Consol. Planning, Inc.*, 603 S.E.2d 147, 156 (N.C. Ct. App. 2004); Bondi Mem. 23.

[62]

*See Barger v. McCoy Hillard & Parks*, 488 S.E.2d 215, 224-25 (N.C. 1997); *Link v. Link*, 179 S.E.2d 697, 704 (N.C. 1971); *White*, 603 S.E.2d at 155-56; *Sterner v. Penn*, 583 S.E.2d 670, 674 (N.C. Ct. App. 2003).

Indeed, some cases appear to hold that not even this distinction separates the two causes of action. *See Compton v. Kirby*, 577 S.E.2d 905, 914-15 (N.C. Ct. App. 2003) ("[A] breach of fiduciary duty amounts to constructive fraud. . . . As we have already determined that plaintiffs established the existence of a fiduciary duty and a breach of that duty, we likewise conclude the issue of constructive fraud was properly submitted to the jury.").

C.      *Count Four: Aiding and Abetting Breach of Fiduciary Duty*

The North Carolina Court of Appeals has recognized a cause of action for aiding and abetting breach of fiduciary duty.[63] The defendants do not dispute that the complaint sufficiently alleges, at a minimum, that the Parmalat insiders breached fiduciary duties in causing Parmalat to enter into the challenged transactions. Nor does the Bank deny that the complaint sufficiently alleges that it aided and abetted such breaches. Rather, the Bank characterizes the claim as one of aiding and abetting a breach of duty owed to Parmalat's stakeholders and then argues that Parmalat did not owe such a duty.[64]

The Bank's characterization is a straw man, set up to be torn down. It simply ignores the fact that the complaint alleges that the Bank aided insiders in breaching duties the insiders owed to Parmalat.  Insofar as the Bank seeks dismissal of Count Four, its motion is denied.

D.      *Count Five: Diversion of Corporate Assets*

The parties tilt at the question of whether North Carolina recognizes an independent claim for diversion of corporate assets. The issue, however, is entirely immaterial, as any diversion of corporate assets, in the context of this case, would be actionable on a theory of aiding and abetting the insiders' breach of fiduciary duty.[65] Count Five therefore is dismissed as redundant.

---

[63]
    *Blow v. Shaughnessy*, 364 S.E.2d 444, 447-48 (N.C. Ct. App. 1988).

[64]
    *See* BoA Mem. 25-27; BoA Reply Mem. 27-28.

[65]
    The presence in the complaint of allegations that Parmalat funds were diverted to BoA officials' pockets does not change this analysis. Any corrupt payments to BoA are imputed to Parmalat, thus triggering *in pari delicto*, unless the Parmalat officials were acting only for themselves in making those payments, a circumstance not alleged in the complaint.

E.     *Count Six: Unjust Enrichment*

A claim for unjust enrichment is a claim in quasi contract and may be asserted only in the absence of any express agreement between the parties.[66]  In this case, all of the disputed transactions were governed by actual contracts.

Bondi responds that (1) the complaint alleges kickbacks to BoA not governed by express contracts, (2) the relevant contracts "were entered into for fraudulent purposes and with bad faith," and (3) Parmalat never received benefits due under the contracts at issue.[67] Argument (1), assuming without deciding that Bondi is correct that the complaint can be read to allege kickbacks not governed by contracts (as opposed to kickbacks governed by contracts that were not written down or disclosed) is barred by *in pari delicto*. Parmalat, through its agents, deliberately paid those kickbacks as part of a corrupt scheme, or so the complaint alleges. Argument (2) also is barred by *in pari delicto* because the Company knew the nature and purpose of its own contracts. Argument (3), even if the complaint could be interpreted to allege that Parmalat never received benefits due under certain contracts – a dubious proposition that the Court nonetheless accepts for the sake of argument – might state a claim for breach of contract (which Bondi has not asserted), but not one in quasi contract.

F.     *Count Seven: Fraudulent Transfer*

The North Carolina Uniform Fraudulent Transfer Act makes certain transfers by a

---

[66]

*Whitfield v. Gilchrist*, 497 S.E.2d 412, 414-15 (N.C. 1998); *Booe v. Shadrick*, 369 S.E.2d 554, 555-56 (N.C. 1988).

[67]

Bondi Mem. 48-52.

debtor, or obligations incurred by it, fraudulent as to its creditors.[68] The statute, however, assigns the remedies for a fraudulent transfer to creditors, not to the debtor, its estate, or a bankruptcy trustee.[69] Accordingly, Count Seven is dismissed.

## G.     Count Eight: Deepening Insolvency

"Generally, the deepening insolvency theory of liability holds that there are times when a defendant's conduct, either fraudulently or even negligently, prolongs the life of a corporation, thereby increasing the corporation's debt and exposure to creditors."[70] Here, Count Eight alleges in substance that BoA:

> "aided and assisted Parmalat's culpable insiders in continuing to borrow billions of dollars of money and at the same time willfully and knowingly concealed their wrongful conduct, acts and omissions from these persons and the world at large.
>
> *     *     *
>
> "[A]s a direct result of Bank of America's conduct and acts and omissions described above, Bank of America, acting in concert with Parmalat's insiders, caused Parmalat's state of financial insolvency to deepen to enormous levels as it caused Parmalat to incur billions of dollars of additional debt at a time when Parmalat was already insolvent and that made it impossible for Parmalat to survive without going into bankruptcy."[71]

The parties dispute whether deepening insolvency is a valid cause of action under North Carolina law. The North Carolina courts barely have considered this question. Nor is there any

---

[68] *See* N.C. GEN. STAT. §§ 39-23.4, 39-23.5 (2005).

[69] *See id.* § 39-23.7.

[70] Jo Ann J. Brighton, *Deepening Insolvency*, 23 AM. BANKR. INST. J. 34 (April 2004).

[71] Cpt. ¶¶ 285, 288.

pen

need to do so here.

If officers and directors can be shown to have breached their fiduciary duties by deepening a corporation's insolvency, and the resulting injury to the corporation is cognizable (a point on which courts are split,[72] but that need not be resolved at this stage), that injury is compensable on a claim for breach of fiduciary duty. And because a third party who aids and abets a breach of fiduciary duty is liable under North Carolina law, Count Four would reach any cognizable damage suffered by the Company by reason of deepened insolvency wrought by the company insiders with the Bank's assistance.

Bondi, however, would go further. He asks this Court to recognize an independent cause of action – that is, a separate tort – for deepening insolvency based on a duty that a lender, according to the submission of Bondi's counsel at argument, owes "not to intentionally, knowingly prolong the life of a business enterprise that it knows to be insolvent, by designing and implementing transactions which conceal the insolvency."[73] But the cases Bondi cites for the existence of such a duty do not recognize it in any form relevant here.[74]

---

[72]

See, e.g., Kittay v. Atlantic Bank of N.Y. (In re Global Serv. Group LLC), 316 B.R. 451, 457-59 (Bankr. S.D.N.Y. 2004) (collecting cases).

[73]

Tr. 29.

[74]

At oral argument Bondi's counsel cited three decisions: Allard v. Arthur Andersen & Co. (USA), 924 F. Supp. 488 (S.D.N.Y. 1996); Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340 (3d Cir. 2001); and Official Committee of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs., Inc.), 299 B.R. 732 (Bankr. D. Del. 2003). Allard merely held that deepening insolvency was a form of injury compensable under other causes of action asserted under New York or Michigan law. There was no discussion of a separate duty or tort. See 924 F. Supp. at 491, 494. Lafferty recognized the possibility of recovery under Pennsylvania law for deepening insolvency without clarifying whether it is a separate cause of action or a theory of damages. See Bondi II, 2005 WL

The Court declines the invitation to recognize a novel tort duty giving rise to a novel cause of action under North Carolina law. North Carolina already imposes on every person a duty not to aid and abet a breach of fiduciary duty by another. On the facts alleged here, if Bondi's proposed duty existed, any breach of it by the Bank would be as well a breach of the duty not to assist Parmalat's insiders in breaching their fiduciary duties to the Company.[75]

Count Eight is dismissed as duplicative.

## H.    Count Nine: Civil Conspiracy

In North Carolina, "[t]he elements of a civil conspiracy are: (1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme."[76]

To the extent that the civil conspiracy count is based on the Bank's role in the challenged financial transactions, Parmalat was a member of the conspiracies set forth in the complaint. That claim therefore is barred by *in pari delicto*. To the extent that the complaint alleges that the Bank's co-conspirators in planning and executing the challenged transactions were not the

---

1670246, at *18. In any case, *Lafferty* did not hold that a lender owes a separate duty not to deepen insolvency. Finally, *Exide* as relevant here held only that unsecured ceditors of a bankrupt corporation could state a claim under Delaware law against a secured lender for deepening the corporation's insolvency. *See* 299 B.R. at 750-52. This motion does not present, and this Court does not decide, the questions whether creditors may assert a claim for deepening insolvency under North Carolina law and what duty, if any, a secured lender owes unsecured creditors in North Carolina.

[75]

*Cf. Bondi II*, 2005 WL 1670246, at *18.

[76]

*Privette v. U. of N.C. at Chapel Hill*, 385 S.E.2d 185, 193 (N.C. Ct. App. 1989); *accord Stetser v. Tap Pharm. Prods., Inc.*, 598 S.E.2d 570, 581 (N.C. Ct. App. 2004).

Company and its constituent entities but, rather, the Company insiders, the claim is identical to the

aiding and abetting breach of fiduciary duty claim. To whatever extent, however, that the claim is

based on an allegation that the Bank conspired with insiders somehow to loot the company, the claim

is sufficient, as all of the elements are satisfied on the face of complaint.[77] Count Nine therefore is

dismissed except to the extent that the Bank conspired with insiders to loot the Company.

I.      *Count Ten: North Carolina General Statutes, Section 75-1.1*

As relevant here, Section 75-1.1 prohibits "unfair or deceptive acts or practices in or

affecting commerce."[78] BoA argues that this claim fails because it applies only where the plaintiff

has suffered in-state injuries. No such injuries are alleged here.[79] Bondi responds that the statute

---

[77]

The Court rejects the Bank's argument that the complaint "fails to allege a meeting of the minds between Bank of America and the Parmalat insiders," BoA Mem. 29-30. Here the allegations that BoA "was an active, knowing participant in the conspiracy of" the Parmalat insiders and that BoA "actively and intentionally participated with these corporate insiders in . . . materially assisting in transferring . . . hundreds of millions of dollars to accounts, funds and entities other than the accounts, funds and entities for which they had been raised," Cpt. ¶¶ 295-96, are more than adequate. *See also id.* ¶ 231 (quoted in footnote 58 above). Also without merit is the Bank's argument that the requisite allegations of wrongful underlying conduct are lacking. Looting a corporation is a sufficient predicate activity for a claim of civil conspiracy.

[78]

N.C. Gen. Stat. § 75-1.1(a); *see also HAJMM Co. v. House of Raeford Farms, Inc.*, 403 S.E.2d 483, 492 (N.C. 1991).

[79]

Bondi's argument that the complaint alleges in-state injuries to the plaintiffs fails. The plaintiff here represents the Parmalat entities in Extraordinary Administration in Italy – all of which are foreign corporations – not the United States Parmalat subsidiaries. It is only the latter, however, that are alleged to distribute products in North Carolina. *See id.* ¶ 34. Paragraph 304 of the complaint, which states that "[u]pon information and belief, the defendants' conduct has substantially affected Parmalat's operations in North Carolina, including without limitation its dairy operations and its ability to conduct financial operations in North Carolina," does not compel a contrary conclusion. The complaint does not use the term "Parmalat" to refer only to the entities represented by the plaintiff.

affords a remedy for out-of-state injuries caused by in-state conduct.

There is a split of authority regarding the reach of Section 75-1.1. The North Carolina state courts have not passed on this issue, but the overwhelming majority of federal district courts to consider it, most of which are in North Carolina, have limited Section 75-1.1's application to "cases involving substantial effect on a plaintiff's in-state business operation."[80] By contrast, one district court has sustained a Section 75-1.1 counterclaim brought by the out-of-state licensees of a fast food franchise against the in-state licensor.[81]

This Court adopts the majority view. A court sitting outside North Carolina owes some deference to the decisions of North Carolina district court judges regarding matters of North Carolina law. In the absence of a clear indication that the North Carolina legislature intended Section 75-1.1 to reach cases in which the plaintiff alleges no substantial effect on in-state business

---

[80]

*The 'In' Porters, S.A. v. Hanes Printables, Inc.*, 663 F. Supp. 494, 502 (M.D.N.C. 1987); *accord Broussard v. Meineke Discount Muffler Shops, Inc.*, 945 F. Supp. 901, 917-18 (W.D.N.C. 1996) (following *Hanes Printables* and denying summary judgment dismissing § 75.1-1 claim where plaintiffs submitted evidence of injurious effects in North Carolina), *rev'd on other grounds*, 155 F.3d 331 (4th Cir. 1998); *Merck & Co. v. Lyon*, 941 F. Supp. 1443, 1463 (M.D.N.C. 1996) (following *Hanes Printables* to dismiss § 75-1.1 claim where plaintiffs failed to allege "a substantial effect on any in-state business operations"); *Jacobs v. Cent. Transport, Inc.*, 891 F. Supp. 1088, 1112 (E.D.N.C. 1995) (M.J.) ("Section 75-1.1 is available to a foreign plaintiff suing a resident defendant over alleged foreign injuries having a substantial in-state effect on North Carolina trade or commerce"), *aff'd in relevant part, rev'd in part*, 83 F.3d 415 (4th Cir. 1996); *Dixie Yarns, Inc. v. Plantation Knits, Inc.*, No. 3:93CV301-P, 1994 WL 910955, at *2-3 (W.D.N.C. July 12, 1994) (dismissing § 75-1.1 counterclaim brought by out-of-state plaintiff alleging out-of-state injuries caused by in-state plaintiff); *see also In re Starlink Corn Prods. Liab. Litig.*, 212 F. Supp. 2d 828, 848-51 (N.D. Ill. 2002) (reviewing the North Carolina district court cases and siding with the majority view represented by *Hanes Printables*); *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 47 F. Supp. 2d 523, 537 (D.N.J. 1999) (applying *Hanes Printables* to dismiss a § 75-1.1 claim).

[81]

*Hardee's Food Sys., Inc. v. Beardmore*, No. 5:96-CV-508-BR(2), 1997 U.S. Dist. LEXIS 9671, at *7-8 (E.D.N.C. June 6, 1997).

operations, this Court concludes that the complaint states no claim under the statute.

### J. Counts Eleven and Twelve: Federal and North Carolina RICO

The Court finds it necessary to address only a few of the many arguments the parties make about the RICO claims. The federal RICO claim states that BoA committed mail fraud, wire fraud, bank fraud, and money laundering, engaged in transactions with money derived from unlawful activity, traveled in aid of racketeering enterprises, and transported stolen money.[82] The complaint, however, does not specify any predicate acts except to set forth certain wire transfers out of a BoA account owned by Parmalat,[83] which are said to have constituted wire fraud.

The complaint fails properly to allege racketeering activity.[84] The wire fraud allegations do not satisfy Rule 9(b). In the RICO context, "[p]laintiffs asserting mail fraud must . . . identify the purpose of the mailing within the defendant's fraudulent scheme."[85] The Court sees no reason why this requirement should not apply also to wire fraud. Bondi has failed to identify the purpose of the wire frauds in the alleged scheme. The allegations other than those pertaining to wire fraud do not specify a single act by BoA. In substance they state only that BoA violated a series of statutes. This is insufficient. "While the pleading standard is a liberal one, bald assertions and

---

[82]

    *See* Cpt. ¶¶ 317, 328-32, 334.

[83]

    *Id.* ¶ 326.

[84]

    *See* 18 U.S.C. § 1961(1) (defining "racketeering activity").

[85]

    *McLaughlin* v. *Anderson*, 962 F.2d 187, 191 (2d Cir. 1992).

conclusions of law will not suffice."[86]

The RICO claim fails for another reason. "[I]n order to prevail in a civil RICO action predicated on any type of fraud" – which is what, on any reasonable view of the complaint, this is – "the plaintiff must establish 'reasonable reliance' on the defendants' purported misrepresentations or omissions."[87] For the reasons discussed above in connection with Counts One and Three, Parmalat cannot establish reasonable reliance.

The North Carolina RICO claim also fails. The North Carolina RICO statute is quite similar to the federal one,[88] but the North Carolina statute allows only an "innocent person" to recover.[89] The Parmalat entities are not innocent persons. A separate problem is that the North Carolina RICO count, the wording of which is nearly identical to that of the federal RICO count, also insufficiently alleges predicate racketeering activity.

Counts Eleven and Twelve are dismissed.

*V. Failure to Join Indispensable Parties*

BoA asks the Court to dismiss the action because Bondi acts only for the Parmalat Debtors – that is, the 23 entities in Extraordinary Administration – and not all of the entities in the Parmalat family that were parties to the complained-of transactions. These other Parmalat entities,

---

[86]

    *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

[87]

    *Bank of China v. NBM LLC*, 359 F.3d 171, 178 (2d Cir. 2004).

[88]

    *Compare* N.C. GEN. STAT. §§ 75D-1 – 75D-14 (2005) *with* 18 U.S.C. §§ 1961-1968 (2005).

[89]

    N.C. GEN. STAT. § 75D-8(c).

argues BoA, are indispensable. The argument is meritless.

Rule 19(a) provides that a person meeting certain criteria – the one relevant here is that the party is "so situated that the disposition of the action in the person's absence may . . . leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest" – shall be joined if feasible. Rule 19(b) provides that if a person coming within subsection (a) of the rule "cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable." It then lists four factors that a court is to take into account in making that determination.

Rule 19 thus requires a three-stage inquiry before dismissal of the action: (1) Is joinder of the party desirable? (2) Is joinder feasible? If not, (3) Is the absent party indispensable such that the action must be dismissed?[90] Here BoA asks only for dismissal, not joinder. The Court therefore assumes that joinder of the relevant absent Parmalat entities is desirable but not feasible and proceeds to consider whether their absence from this action offends "equity and good conscience."

The Court concludes that it does not. One of the Rule 19(b) factors is whether "protective provisions in the judgment" can lessen or avoid the asserted prejudice to the defendants. Any judgment in this action easily could be tailored to permit Bondi to collect only so much as is necessary to compensate the Parmalat Debtors, as opposed to the entire Parmalat family. The other

---

[90] *See, e.g.*, *ConnTech Dev. Co. v. U. Conn. Educ. Properties, Inc.*, 102 F.3d 677, 681-82 (2d Cir. 1996).

Rule 19(b) factors do not point in a different direction.[91] "[T]he fact that the defendants may be required to defend more than one action arising from the same tort" does not necessarily render the absent parties indispensable.[92] The members of the Parmalat family not in Extraordinary Administration are not indispensable to this action.

## VI.  Subject Matter Jurisdiction

Although no party has raised the issue, the dismissal of the RICO claim eliminates the court's jurisdiction under Section 1331 (the remaining claims arise under state law) as well as under Section 1332 (there are foreign parties on both sides of this suit). Continuing jurisdiction under Section 1367 is doubtful at best.[93] None of this, however, mandates dismissal of the action. Section 1334 confers on the federal district courts jurisdiction over any action "related to" a bankruptcy case. Like Bondi's action against Parmalat's auditors and their affiliates, and for the same reasons,[94] this action is related to a bankruptcy case.

---

[91]

The Court is mindful that one of several interests protected by Rule 19(b) is a joined party's "wish to avoid multiple litigation, or inconsistent relief, or sole responsibility for a liability he shares with another." *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 109-110 (1968). Inconsistent relief and sole responsibility for a liability shared with another are not serious concerns here. To the extent, however, that BoA faces the theoretical potential for multiple litigation – and BoA has given the Court no reason to believe that other Parmalat entities are likely to bring claims like those advanced here – that concern is outweighed by the other Rule 19(b) considerations.

[92]

*See Arkwright-Boston Mfrs. Mut. Ins. Co. v. City of New York*, 762 F.2d 205, 209 (2d Cir. 1985); *see also United States v. Aetna Cas. & Surety Co.*, 338 U.S. 366, 382 (1949).

[93]

*See, e.g.*, *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966) (observing in the context of pendent jurisdiction that "if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well.").

[94]

*See Bondi I*, 322 B.R. at 47-49.

*VII.    Conclusion*

BoA's motion to dismiss is granted to the extent that Counts One, Two, Three, Five, Six, Seven, Eight, Ten, Eleven and Twelve, Count Nine except insofar as it rests on allegations that Parmalat insiders looted the Parmalat Debtors, and so much of Counts Four and Nine as assert claims or seek recovery on behalf of Parmalat's creditors, are dismissed. The motion is otherwise denied. The plaintiff may file an amended complaint repleading only Counts Eleven and Twelve on or before August 22, 2005.  If he does amend, he shall serve and furnish to chambers a red- or black-lined version that highlights the amendments.

SO ORDERED.

Dated: August 5, 2005

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)